Robert SUTTON; Marlene Sutton, Plaintiffs,

v.

Virl EARLES, Third–Party–Defendant–Appellee,

v.

UNITED STATES of America, Defendant–Third–Party–Plaintiff–Appellant.

Stephen BRENNAN, Plaintiff,

v.

Virl EARLES, Third–Party–Defendant–Appellee,

v.

UNITED STATES of America, Defendant–Third–Party–Plaintiff–Appellant.

Ernest E. CHAVEZ; Carol Kemble; Terez UJJ, Individually and as Representative of the Estate of John Bakos; Robert D. Hulings et al., Plaintiffs–Appellees,

v.

UNITED STATES of America, Defendant–Third–Party–Plaintiff–Appellant.

Ernest E. CHAVEZ; Carol Kemble; Terez UJJ, Individually and as Representative of the Estate of John Bakos; Robert D. Hulings et al., Plaintiffs–Appellees,

v.

UNITED STATES DEPARTMENT OF DEFENSE; United States Department of the Navy; United States Army Corps of Engineers; United States Coast Guard, Defendants–Appellants.

Virl EARLES, Plaintiff–Appellee,

v.

UNITED STATES of America, Defendant–Appellant.

Stephen BRENNAN, Plaintiff–Appellee,

v.

Virl EARLES, Third–Party–Defendant–Appellee,

v.

UNITED STATES of America,

Defendant–Third–Party–Plaintiff–Appellant.

Marie KATZ, Individually, and as Personal Representative of the Estate of Ronald Flem Meyers, Deceased, Plaintiff–Appellee,

v.

Virl EARLES, Third–Party–Defendant,

v.

UNITED STATES of America, Defendant–Third–Party–Plaintiff–Appellant.

Nos. 92–55548, 92–55549, 92–55551, 92–55564 and 92–55578 to 92–55580.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 30, 1993.

Decided June 3, 1994.

Dennis P. Gauhan, Gauhan and King, Long Beach, CA, for plaintiffs and appellees Marie Katz, individually and as the personal representative of Ronald Flem Meyers.

Neal Hirschfeld, Greenspoon, Marder, Hirschfeld & Rafkin, Fort Lauderdale, FL, for plaintiffs and appellees Carol Kemble, Ernest E. Chavez, Estelle Schmid, individually and as representative of the Estate of Kathy Weaver, Roberta Hulings, individually and as representative of the Estate of Patricia Hulings, Terez UJJ, individually and as representative of the Estate of John Bakos, and Robert Weaver, individually.

Martin Stein, Robert A. Olson, Greines, Martin, Stein & Richland, Beverly Hills, CA, for plaintiffs and appellees Ernest Chavez, Carol Kemble, Marie Katz, individually and as representative of the Estate of Ronald Flem Meyers, Roberta Hulings, individually and as representative of the Estate of Patricia Hulings, Terez UJJ, individually and as representative of the Estate of John Bakos, Estelle Schmid, individually and as representative of the Estate of Kathy Weaver, and Marlene and Richard Sutton, as heirs of Anthony Sutton.

Mark D. Wenzel, Stone & Dolinger, Los Angeles, CA, Martin Stein, Robert A. Olson, Greines, Martin, Stein & Richland, Beverly Hills, CA, for plaintiffs and appellees Marlene and Richard Sutton, as heirs of Anthony Sutton.

Before: TANG, CANBY, and BEEZER, Circuit Judges.

Opinion by Judge CANBY.

CANBY, Circuit Judge:

The plaintiffs are four survivors and the representatives of five deceased victims of an allision between a pleasure boat and a Navy mooring buoy. They obtained a judgment against the United States in this negligence action brought under the Suits in Admiralty Act ("SIAA"), 46 U.S.C.App. §§ 741–752 (1988). In a prior appeal, we held that the discretionary function exception set forth in the Federal Tort Claims Act should be read into the SIAA. *Earles v. United States (Earles I)*, 935 F.2d 1028, 1032 (9th Cir.1991). We vacated the judgment and remanded for a determination whether the government's actions and omissions in this case fell within the discretionary function exception, thus precluding liability on the part of the United States. The district court found the exception inapplicable, and the United States appeals.[1] The government further challenges the district court's negligence findings, as well as the amount, type and manner of calculation of the damage awards. We AFFIRM in part, REVERSE in part and REMAND.

## I. The Government's Liability

The facts of the accident giving rise to this action are set forth more fully in our prior opinion, *Earles I*, 935 F.2d at 1029–30. Five people died and four people were injured when a pleasure craft, the WHISKEY RUNNER, operated by Virl Earles, ran into a mooring buoy designated "Oscar 8" within the waters of the United States Naval Weap-

---

1. The district court, upon remand, filed "New and Amended Findings of Fact and Conclusions of Law," without entering a new judgment; the only substantive change being in regard to the discretionary function exception issue upon which we had remanded. Although no new judgment was entered, it is clear that the district court intended the new findings and conclusions to resolve the remanded issue, leaving in place its original judgment. In this circumstance, we conclude that the amended findings of fact and conclusions of law are an appealable final judg-

ment for the purposes of 28 U.S.C. § 1291 and that we have jurisdiction over this appeal. *Cf. Bankers Trust Co. v. Mallis*, 435 U.S. 381, 382–85, 98 S.Ct. 1117, 1118–20, 55 L.Ed.2d 357 (1978) (Appellate courts can exercise jurisdiction despite district court failure to enter a separate document of judgment). "Nothing but delay would flow from [dismissal of this appeal]" whereupon "the district court would simply file and enter the separate judgment, from which a timely appeal would be taken." *Id.* at 385, 98 S.Ct. at 1120.

ons Station in Huntington Harbor, California. The district court found both the government and Earles to have been negligent and judged each to be responsible for fifty percent of the losses caused by the allision.

The district court based its finding of government negligence upon the following acts and omissions: (1) the government permitted the development of Huntington Harbor with the understanding that pleasure boaters would traverse the Weapons Station, yet did not take precautions to monitor the safety of such boaters; (2) the government failed to maintain a system of permits for boaters within the Weapons Station as "required" by federal regulations; (3) the government had abandoned its previous policy of briefing boaters on the rules and regulations for transit within the Weapons Station waters and of issuing permits to boaters for use of those waters—a policy that had ensured that boaters in the harbor were competent; (4) the government should have known that boaters in the Weapons Station would be minimally qualified to operate their craft because California requires nothing more than an automobile license for boat operators; (5) the government should have foreseen that intoxicated boaters would traverse the Weapons Station waters and it had a duty to take reasonable actions to protect the harbor users; (6) the government did not mark the speed limit in the harbor adequately in that the speed limit signs were not lighted and did not indicate adequately the area in which the speed limit applied; (7) the government failed to illuminate Oscar 8, an obstacle to navigation; (8) the government abandoned an earlier system that provided easy access to information regarding the Weapons Station—a system that enabled boaters to familiarize themselves with the facility.

The government challenges the negligence finding on the grounds that: (1) all of its actions fall within the discretionary function exception to the SIAA's waiver of sovereign immunity; (2) even if the exception does not apply, the government owed no duty to plaintiffs; (3) even if the government owed a duty to plaintiffs, the district court's finding of negligence was clearly erroneous.

### A. Discretionary Function Exception

■ We review *de novo* the district court's determination that the actions and omissions of the government in this case fall outside the scope of the discretionary function exception. *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1021 (9th Cir.1989). The discretionary function exception is a qualification on the federal government's general waiver of sovereign immunity for tort claims and is explicitly codified within the Federal Tort Claims Act ("FTCA"). Pursuant to the exception, the government retains sovereign immunity from suit for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

[We] apply a two-step test for determining whether the discretionary function exception applies. We must first consider whether the action is a matter of choice for the acting employee. The discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. If the challenged conduct does involve an element of judgment, our second step is to determine whether that judgment is of the kind that the discretionary function exception was designed to shield. To be shielded the judgment must be grounded in social, economic, and political policy.... We must examine separately [each claimed negligent act].

*Kennewick,* 880 F.2d at 1025 (internal quotes, ellipses and citations omitted).

### 1. Vessel Control/Boater Competence

The government challenges the district court's determination that the discretionary function exception does not apply to the omissions of the government regarding programs designed to train and issue permits to boaters that use the harbor—elements of negligence one through five and eight of the district court's decision, laid out above. We agree with the government that the discre-

tionary function exception encompasses certain of its omissions.

■ The first question is whether the decision to enforce boater regulations or not was discretionary at all. As the district court recognized, the discretionary function exception does not protect the government when it elects not to perform a duty that a statute or regulation requires it to perform. *See Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). In such a case, the government "employee has no rightful option but to adhere to the directive," and there is no discretion for the exception to protect. *Id.* The plaintiffs argue that the regulations of the Corps of Engineers set forth in the margin [2] impose a mandatory duty on the Navy to enforce a system of boater regulation.

Whether these regulations imposed a mandatory duty upon the Weapons Station Commander is essentially a question of statutory interpretation; we conclude that they did not. There is no question that the regulations impose a number of duties on those who operate private watercraft: their craft must be registered and documented; they must follow prescribed routes; they must obey all posted signs and instructions; and so on. 33 C.F.R. § 204.195(b)(1), (6), and (11). These provisions undoubtedly deprive private boaters of any choice whether or not to obey the system of regulation that is put in place pursuant to the regulation. There is an important distinction, however, between a regulation that mandates certain private behavior, leaving the government to enforce it, and a regulation that mandates particular action by the government. *See Baker v. United States*, 817 F.2d 560, 565–66 (9th

2. Anaheim Bay Harbor, Calif.; Naval Weapons Station, Seal Beach.

(a) *The danger zone.* The waters of Anaheim Bay Harbor between the east and west jetties at the United States Naval Weapons Station, Seal Beach California, and the contiguous tidal channel and basin as far east as the Pacific Electric Railway bridge.

(b) *The regulations.* (1) Passage and transit of Anaheim Bay and Harbor is permitted to regularly documented vessels and power boats having a Certificate of Number assigned by the State of California Division of Small Craft Harbors subject to these regulations and the military operation within the area.

(2) All craft authorized for transit of this area and properly registered in the Security Office with the name and address of owner, description, color, and size of the craft, will be provided a decal for identification at the time of registration. The decal must be displayed on the windshield or such other area to permit security personnel to view the decal.

(3) Decals will not be transferred from one boat to another nor from one person to another, and must be destroyed when no longer desired by the individual originally registering the boat.

(4) Sailing vessels shall use auxiliary power in the inner harbor area.

(5) Rowboats, canoes, kayaks, surfboards, water skis, etc., are specifically prohibited within the danger and controlled zones.

(6) All boats shall proceed through the danger zone by the route prescribed by the enforcing agency.

(7) Speed shall not exceed 8 knots in the outer harbor and 3 knots in the inner harbor. Private boats unable to throttle down or to maintain steerage way at 3–knot speed may

proceed at the minimum speed (in excess of 3 knots) consistent with good seamanship and with waterborne explosive handling operations in progress. In case of doubt, boat operators of inbound boats will remain in the west end of the basin and outbound boats in the east end of the basin until informed of the completion of the waterborne explosive handling hazard. (The hazard is usually the hand passing of live ammunition from small boats to lighters moored at the east end of the wharf.)

(8) Smoking in boats is prohibited during the transit of this area.

(9) All craft of whatever category shall have the right at any time to seek shelter in these waters because of stress of weather. Boats entering the area during the hours of darkness, seeking shelter, or seeking transit, shall stop at the dock located near the bridge and clear with the posted sentry.

(10) Nothing in these regulations of this section shall be construed as relieving the owner or persons in command of any vessels or plant from the penalties of the law for obstructing navigation or for not complying with the navigation laws in regard to lights or signals or for otherwise violating law.

(11) All boats shall heed and obey all posted signs and/or instructions issued by security personnel of the U.S. Naval Weapons Station.

(12) The regulations in this section shall be enforced by the Commanding Officer, U.S. Naval Weapons Station, Seal Beach, Calif., and such agencies as he may designate. For clarification or other information, the U.S. Naval Weapons Station, Officer of the Day, should be contacted.

33 C.F.R. § 204.195 (1984) (in effect at the time of the allision but subsequently withdrawn).

Cir.1987), *cert. denied,* 487 U.S. 1204, 108 S.Ct. 2845, 101 L.Ed.2d 882 (1988). The operative provisions of the Corps of Engineers regulation are clearly directed at boaters.

■ It is true that the regulation states that "[t]he regulations in this section shall be enforced by the Commanding Officer, U.S. Naval Weapons Station." 33 C.F.R. § 204.-195(11). In context, we view this provision as simply a designation of the officer who will exercise enforcement authority, rather than as a mandate requiring that officer to perform specific enforcement actions. Unlike the provisions imposing duties on boaters, the subsection referring to enforcement is extremely general. The discretionary function exception is rendered inapplicable when the agency fails to act "in accord with a *specific* mandatory directive." *Berkovitz,* 486 U.S. at 544, 108 S.Ct. at 1963 (emphasis added); *see also Starrett v. United States,* 847 F.2d 539, 541 (9th Cir.1988) (plaintiffs must "show that the government violated a 'specific mandatory' requirement in order for the discretionary function exception to be overcome") (citation omitted). A general provision that the Commander of the Weapons Station shall enforce "[t]he regulations in this section" is not, in our view, sufficiently specific to deprive the Commander of all discretion whether to enforce every provision in the section directed at private boaters. It is not comparable to the regulations in *Berkovitz,* which provided that a vaccine "license shall be issued only upon examination of the product and upon a determination that the product complies with the standards prescribed in the regulations," and that "[a]n application for license shall not be considered as filed" until the regulating agency receives compliance data from the manufacturer. *Berkovitz,* 486 U.S. at 542, 108 S.Ct. at 1961 (quoting 42 C.F.R. §§ 601.4, 601.2 (1987)). Those are the types of specific directives, aimed at the government, that deprive the subject agency of discretion for purposes of tort liability. We have nothing like that here.

The government, then, did have discretion whether to enforce the various provisions of the system of boater control outlined in the regulations. The next question is whether that discretion is of the type protected by the discretionary function exception. That question is largely answered by *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

In *Varig,* the Supreme Court held that the FAA's adoption and implementation of a "spot-check" program for aircraft certification was within the discretionary function exception of the FTCA. The Court elaborated upon the nature of the exception:

> [T]he basic inquiry ... is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.... [W]hatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as regulator of the conduct of private individuals.... This emphasis upon protection for regulatory activities suggests an underlying basis for the inclusion of an exception for discretionary functions in the Act: Congress wished to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.

*Id.* at 813–14, 104 S.Ct. at 2764–65 (footnote omitted).[3] Applying these principles to the issue before it, the Court stated: "When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Id.* at 819–20, 104 S.Ct. at 2767.

Here the government offers a variety of reasons why it did not enforce the boater regulation system: the system would have strained the Weapons Stations' economic and personnel resources; it would have interfered with the Station's military mission; it

---

**3.** For a complete review of the Supreme Court's key decisions developing the contours of the discretionary function exception through 1989, see our opinion in *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018 (9th Cir.1989).

would have involved an oppressive degree of control over private activities; and it was largely unnecessary because the munitions handled in the harbor were normally without fuses, and fused ammunition was always placed under armed guard. We need not evaluate each of these concerns individually. In totality, they constitute the kind of policy considerations that typically underlie broad discretionary enforcement decisions of a regulatory authority. The decisions not to enforce the system of access regulation and not to undertake programs to insure boater competence were exercises of discretion analogous to the actions of the FAA in *Varig.* Accordingly, these actions fall within the discretionary function exception, and the government's liability cannot be based upon the omissions the district court listed as negligent acts or omissions numbered one through five and eight.[4]

### 2. Speed Limit Posting

■ In the context of this case, we come to a different conclusion regarding the failure adequately to post speed limit signs,[5] the sixth omission upon which the district court based its negligence finding. The key point here is that the Navy had placed a partially submerged obstruction to navigation in its waters, through which private boaters regularly passed. The Navy's failure to post a speed limit sign thereafter was more than a failure to enforce a general system of regulation; it can reasonably be regarded as a failure to warn. In light of the hazard in the water, the Navy's failure to post the speed limit adequately is not protected by the dis-

cretionary function exception because the omission was not one grounded in social, economic or political policy. *See Kennewick,* 880 F.2d at 1025.

A decision not to warn of a specific, known hazard for which the acting agency is responsible is not the kind of broader social, economic or political policy decision that the discretionary function exception is intended to protect. We so held in *Summers v. United States,* 905 F.2d 1212, 1215–17 (9th Cir. 1990). In *Summers,* the National Park Service had instituted a policy of requiring fires to be built in designated "fire rings" on a beach. We held that the Park Service's failure to warn the public of the danger of hot coals to bare feet in the area of the fire rings was not protected by the discretionary function exception. The district court's ruling here, that the Navy failed to post speed limit signs that would make the public aware of the need to proceed slowly in the area of the buoys, is comparable.

Also analogous is our decision in *Seyler v. United States,* 832 F.2d 120, 123 (9th Cir. 1987). In *Seyler,* the government constructed a road and failed to post the speed limit; we held this failure not to be within the discretionary function exception. Here, the government placed obstructions within navigable waters and again failed properly to post a safe speed limit. As in *Seyler,* we are not convinced that "any decision not to provide adequate signs [was] of the nature and quality that Congress intended to shield from tort liability." *Id.* (quotation omitted).[6]

---

4. We note also that the boating regulations appear to be intended primarily to insure against private interference with Navy munitions loading, and to protect against the dangers of explosion, not the normal hazards of navigation. *Cf. Doggett v. United States,* 875 F.2d 684, 691 (9th Cir.1989) (California statute imposing governmental liability for failure to perform mandatory duty applies only when law imposing duty was intended to protect against the kind of risk of injury suffered by plaintiff).

5. Although a speed limit sign was posted, the district court found that the sign was unlit and that it failed to make clear that the limit applied in the area in which the allision occurred.

6. As in *Seyler* and *Summers,* there was no evidence here that the Navy's failure adequately to

post speed limit signs was the result of a conscious policy decision, *see Seyler,* 832 F.2d at 123; *Summers,* 905 F.2d at 1215, but that is not the essential point. The government need not show that a conscious decision weighing competing policy concerns in fact was made. *In re Consolidated United States Atmospheric Testing Litigation,* 820 F.2d 982, 998 (9th Cir.1987). The essential point is that the decision not to post appropriate speed limit signs after creating a hazard to navigation is not the kind of policy decision protected by the discretionary function exception. *See Kennewick,* 880 F.2d at 1028 ("the relevant question is not whether an explicit balancing is proved, but whether the decision is susceptible to policy analysis") (citing *United States Fidelity & Guaranty Co. v. United States,* 837 F.2d 116, 120–21 (3d Cir.1988)).

In contrast is our decision in *In re Consolidated United States Atmospheric Testing Litigation,* 820 F.2d 982, 998 (9th Cir.1987). There we held that a government decision not to warn the public of the health hazards arising from atomic testing was within the discretionary function exception. Such a decision obviously involved sensitive governmental questions of the highest policy: " 'In no sense can such a decision be equated with decisions to warn of submerged obstructions to navigation or flash floods.... The conclusion is inescapable that every aspect of a warning program is a matter that falls within the discretionary function exception as defined in *Varig* and *Dalehite* [*v. U.S.,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) ].' " *Id.* at 998 (quoting district court). The distinctions between the kind of a failure to warn involved in *Atmospheric Testing* and that in our case are therefore both explicit and obvious.

We conclude, accordingly, that the district court did not err in ruling that the government's failure to post adequate speed limit signs was not within the discretionary function exception.

### 3. Illumination of Oscar 8

■ The plaintiffs do not argue that any statute or regulation removed the government's discretion with respect to its decision not to illuminate Oscar 8. Thus, we proceed directly to the second step of our analysis in deciding whether this failure, the seventh act or omission relied upon by the district court in its negligence finding, falls within the discretionary function exception. We conclude that the failure to illuminate Oscar 8 does not fall within the discretionary function exception for the same reasons that the failure to post the speed limit adequately was without the exception: the omission amounted to a failure to warn of an obstruction to navigation that the Navy had placed in navigable waters. The decision not to illuminate the buoy was not of a kind involving social, economic, or political policy.

The government argues, however, that it cannot be held liable for the *Navy*'s failure to mark the obstruction when the *Coast Guard* never chose to mark the buoy pursuant to its authority to mark obstructions to navigation on any navigable waters of the United States.[7]

We can assume without deciding that decisions of the Coast Guard not to mark existing obstructions normally would fall within the discretionary function exception of the SIAA. This conclusion, however, does not imply that the Navy cannot be held liable for its failure to mark an obstruction that it placed in navigable waters. Congress has granted the Coast Guard broad authority to scan the navigable waters of the United States and to mark *any* obstructions to make those waters safer for navigation, regardless of whether that obstruction was placed by the United States, is a natural obstruction, or was placed by private entities. Whether or not to expend limited resources to mark any given obstruction to alleviate the particular level of risk associated with the obstruction may well be a decision grounded in social, economic and political policy that Congress intended to shield from liability with the discretionary function exception. The decision of the Navy not to warn boaters of an obstruction to navigation that the Navy itself placed in navigable waters that the Navy knew to be traversed by pleasure boat traffic, on the other hand, is much narrower and, as we concluded above, is not a decision of the type Congress intended to shield from liability.

### B. Duty

■ We now turn to the government's argument that it owed no duty to warn boaters of the obstructions and therefore cannot be liable to the plaintiffs for an alleged breach of that duty. Under the SIAA, the United States consented to suit "[i]n cases where if ... a private person or property were involved, a proceeding in admiralty could be maintained." 46 U.S.C.App. § 742 (1988). "Such suits shall proceed and shall be heard

---

7. 14 U.S.C. § 86 provides:
The Secretary [of Transportation] may mark for the protection of navigation any ... obstruction existing on any navigable waters ...

of the United States in such manner and for so long as, in his judgment, the needs of maritime navigation require.

and determined according to the principles of law and to the rules of practice obtaining in like cases between private parties." *Id.* § 743. Thus, the substantive law we must look to in determining whether a duty to warn existed is the general maritime law. *Accord* Thomas J. Schoenbaum, Admiralty and Maritime Law § 19–1 n. 43 (Practitioner's ed. 1987 & Supp.1992).

■ "[F]ederal courts have authority to develop a *substantive* body of *general maritime law* applicable to cases within the admiralty and maritime jurisdiction." *Id.* § 4–1 (footnote omitted). "The general maritime law affords redress for injuries and damage caused by negligence." *Id.*

> The general maritime law, however, is not a complete or all-inclusive system. When new situations arise that are not directly governed by legislation or admiralty precedent, federal courts may fashion a rule for decision by a variety of methods. Federal courts may, and often do, look to state statutory law and to precepts of the common law which they "borrow" and apply as the federal admiralty rule.

*Id.* (footnotes omitted). Thus, in determining whether the government had a duty to warn boaters of the danger presented by Oscar 8, we look to maritime precedent and general principles of the common law of torts.[8]

"A duty of care exists when injury is foreseeable." *Id.* § 4–2. The district court concluded that the danger presented by Oscar 8 to pleasure boaters was foreseeable. The Weapons Station waters were situated between the Pacific Ocean and Huntington Harbor. The court found that the government was aware that a significant amount of boat traffic seeking transit in and out of Huntington Harbor was required to traverse the Weapons Station waters. In these circumstances, it is certainly foreseeable that an allision between a boat and a submerged obstacle to navigation could occur; the district court did not err in so ruling.

■ The government argues that it has no duty to warn of hazards in waters that it owns. It relies on *Faust v. South Carolina State Highway Dept.,* 721 F.2d 934 (4th Cir. 1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984), where the court said:

> [N]o authority ... holds that the United States may be held liable on a common law tort theory of failure to maintain safe conditions on navigable waters which it "owns" ... The principle laid down in *Indian Towing* [*Co. v. U.S.,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48] requires no more than that the government not injure sailors or boaters by inducing reliance on misleading navigational aids. It imposes no general duty upon the government to ensure navigable waters are safe or to provide warning devices.

*Id.* at 939. We do not necessarily take issue with this statement, but it is not our case. In *Faust,* the United States and the South Carolina Highway Department were sued for injuries resulting from an allision between a motorboat and a steel cable placed *by the Highway Department* to guide a ferry across a canal in the Atlantic Intracoastal Waterway. *Id.* at 936. For the *United States* to be liable in *Faust* would have required finding a general duty on the part of the United States to ensure the safety of navigable waters. In contrast, our decision imposes no *general* duty to ensure the safety of navigable waters. We merely conclude that the Navy must take reasonable precautions to warn of dangers it creates by placing obstructions within the navigable waters of its Weapons Station. Indeed, the government admits that it owed the same duty imposed upon private parties whose property abuts or includes navigable waters—a duty to exercise reasonable care. Appellant's Brief at 23 (citing *Smith v. Burnett,* 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756 (1898)). We agree with the district court that this duty includes a duty to warn those lawfully plying the Weapons Station waters of the hazard placed there by the Navy.

Finally, we reject the government's contention that it has no duty to protect those who are negligent. The fallacy of this argu-

---

**8.** The question of the existence of a duty is a matter of law subject to *de novo* review in maritime law, just as it is in the common law of torts. *See id.* § 4–2.

ment is obvious from the fact that the principle of comparative fault applies to maritime accidents. *See infra* note 12.

### C. Negligence Finding

■■■■ Having decided that the government is not entirely shielded by the discretionary function exception and that the government was under a duty to exercise reasonable care, we now consider the government's challenge to the district court's negligence determination. We review the district court's determination of negligence under the clearly erroneous standard. *Vollendorff v. United States,* 951 F.2d 215, 217 (9th Cir. 1991). We conclude that the determination was not clearly erroneous.

Ample evidence supported a finding of government negligence in this case. It was undisputed that the government placed the buoy in the water. It also was clear that the government knew that recreational boaters must traverse the Weapons Station waters for access to and from Huntington Harbor. Despite the fact that Oscar 8 was in a portion of the water not usually traversed by such craft, it was not unreasonable for the district court to conclude that the government had reason to know that inexperienced boaters might venture into that area. In these circumstances, where the government has failed to show that it undertook any reasonably effective means of alerting boaters to the danger presented by the obstruction (whether by illumination, an adequate speed limit posting or other means), a finding of government negligence is not clearly erroneous.

### D. Joint Enterprise/Contributory Negligence

■■■■ Finally, the government asserts that the passengers' recovery is barred or should be reduced because the passengers were engaged in a joint enterprise with Mr. Earles and that his negligence therefore must be imputed to the passengers. The district court found there was no joint enterprise,

however, and that finding is not clearly erroneous. There was no showing that any of the plaintiffs other than Earles had control of the boat, and joint control is part of the doctrine of joint venture. *See Flores v. Brown,* 39 Cal.2d 622, 248 P.2d 922, 925 (1952). Nor was there evidence of a common business, financial or pecuniary interest among the plaintiffs with regard to the voyage. *See DeSuza v. Andersack,* 63 Cal. App.3d 694, 701, 133 Cal.Rptr. 920, 925 (1976).

■■■ Alternatively, the government asserts that the passengers themselves were contributorily negligent because they did not exercise due care; they "merely washed their hands of any concern about their own safety." [9] It was the government's burden, however, to prove negligence on the part of the plaintiffs. *See Firth v. United States,* 554 F.2d 990, 993 (9th Cir.1977). The government now recites in its brief, without reference to the record, that the plaintiffs "must have been aware that Mr. Earles had been drinking during the course of the evening." It also states that "nothing in the record indicates any of the passengers at any time sought to determine whether or not Mr. Earles was capable of operating the boat and familiar enough with the waters to operate it at that hour in a safe manner." Similarly, "there is nothing in the record to indicate any of the passengers ever expressed concern considering the speed at which Mr. Earles was operating the vessel." There may be many things the record does not show, but it is now incumbent on the government to point to evidence in the record that indicates that the district court's finding of no negligence was clearly erroneous. This the government has not done. Nor has it presented us with any authority for the proposition that merely being a passenger in a boat piloted by a person who had been drinking constitutes negligence as a matter of law. *See Skidmore v. Grueninger,* 506 F.2d 716,

---

**9.** The plaintiffs contend, with considerable justification, that the issue of comparative negligence was never properly raised in district court. The district court so stated, pointing out that the government had not filed a third-party complaint against any plaintiff except Earles, and had not

included the issue in the joint pretrial conference order. The government points to its proposed finding on comparative negligence, and contends that the pretrial conference order was never filed. In light of the uncertainty, we rule on the merits of the question, as did the district court.

725–26 (5th Cir.1975) (upholding finding of no negligence by boat passenger who knew operator had been drinking, but had not been shown to know that he was unable properly to operate boat). We therefore affirm the district court's ruling on comparative negligence.

### E. Conclusion on Government Liability

■■■ In summary, we have held that: (1) the district court erred insofar as it based its finding of government negligence upon the government's omissions with respect to boater competence and vessel control programs because the decision not to implement such programs is shielded from tort liability under the SIAA's discretionary function exception; (2) the district court did not err, however, in ruling that the discretionary function exception did not protect the government from liability for its negligence in failing to warn of an obstruction to navigation that it placed in the water as evidenced by its failure to illuminate Oscar 8 and its failure to post the speed limit adequately; (3) the government owed a duty of reasonable care to the plaintiffs; (4) the district court's finding that the government breached that duty was not clearly erroneous; and (5) the recovery of plaintiffs other than Earles should not be reduced for imputed or comparative negligence. Because we have held that the district court's finding of government negligence was impermissibly based upon some omissions that are shielded by the SIAA's discretionary function exception, we remand to the district court to allow that court to consider whether the fifty-fifty apportionment of fault between the government and Mr. Earles[10] is still warranted.[11]

### II. Damages

The government asserts that the district court's damage awards are erroneous because: (1) the wrongful death awards should not have included amounts for loss of society; (2) even if loss-of-society damages are available, only survivors who establish their dependence upon a decedent can recover such damages; (3) the district court's across-the-board approach to the wrongful death awards established that the awards are clearly erroneous; (4) the district court erred in basing its calculation of loss-of-society awards upon the life expectancies of the decedents instead of those of the survivors; and (5) the award of future lost wages to Stephen Brennan after Brennan had died from causes unrelated to the allision was clearly erroneous. We address each of these contentions in turn.

### A. Loss of Society; Dependency Requirement

In order to understand the government's arguments regarding damages for loss of society, it is necessary to describe certain historical developments in the law governing deaths at sea. Until 1970, there was no wrongful death cause of action for survivors under the general maritime law; that rule had been established in *The Harrisburg*, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886). Congress had largely cured this deficiency with regard to seamen by providing remedies for negligent wrongful death in the Jones Act, now 46 U.S.C.App. § 688 (1988). It had also provided a wrongful death cause of action for survivors of anyone killed outside of a state's territorial waters, in the Death on the High Seas Act (DOHSA), now 46 U.S.C.App. §§ 761–68 (1988).

This left only an anomalous group—survivors of non-seamen who died in territorial waters—with an uncertain wrongful death remedy, dependent upon the varying laws of

---

**10.** The district court found Earles to be negligent because (1) he was intoxicated and speeding at the time of the allision, (2) he was unfamiliar with the facility through which he was navigating on a dark night and therefore should have taken extra precautions in operating the WHISKEY RUNNER and (3) the WHISKEY RUNNER was not properly lit.

**11.** "When two or more parties have contributed by their fault to cause property damage in a

maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and ... liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault." *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715–16, 44 L.Ed.2d 251 (1975).

the states.[12] The Supreme Court filled this gap in 1970 by recognizing a wrongful death cause of action under the general maritime law, in *Moragne v. States Marine Lines*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). Three years later, the Court fleshed out its judicially created maritime cause of action, holding that survivors were entitled to recover, among other things, damages for loss of society. *Sea–Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 591, 94 S.Ct. 806, 818, 39 L.Ed.2d 9 (1973). In so doing, the Court recognized that it was permitting recovery for damages that were not compensable under the Death on the High Seas Act. *Id.* at 588 n. 22, 94 S.Ct. at 816 n. 22. The fact that Congress had provided that DOHSA not extend to territorial waters, where state law prevailed at the time, indicated that Congress was not concerned by a lack of uniformity of damages. *Id.*

Since *Gaudet,* the Court has refused to expand the remedy for loss of society to cover deaths on the high seas; to do so would be inconsistent with the limitation of recovery to "pecuniary loss" in DOHSA. *Mobile Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978). In so ruling, the Court again acknowledged that, with regard to damages, there was a lack of uniformity between wrongful death recoveries on the high seas and in territorial waters, but it regarded this divergence as "only a minor threat" to the overall uniformity of maritime law. *Id.* at 624, 98 S.Ct. at 2014. Some years later, the Court employed similar reasoning to preclude recovery for loss of society in Jones Act suits for wrongful death of seamen; the Jones Act was construed to embody the limitation to pecuniary loss that had consistently been read into the original wrongful death statute, Lord Campbell's Act. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32, 111 S.Ct. 317, 325, 112 L.Ed.2d 275 (1990).

Against this background, the district court in the present case awarded the parents of the decedents substantial damages for loss of society. The reasons for doing so are straightforward and, in our view, justifiable. *Gaudet* itself authorizes recovery for loss of society in cases of wrongful death in a state's territorial waters. It is true that DOHSA and the Jones Act would not permit an award of such non-pecuniary damages, but DOHSA does not apply because the death was not on the high seas (beyond the three-mile limit), and the Jones Act does not apply because the decedents were not seamen. Parents may recover because they are common beneficiaries of wrongful death statutes, and DOHSA itself authorizes awards for the benefit of "the decedent's wife, husband, parent, child or dependent relative." 46 U.S.C.App. § 761. The Jones Act also permits recovery for the benefit of parents, if there is no surviving spouse or child. 46 U.S.C.App. § 688 (incorporating 45 U.S.C. § 51).

The government, however, would derive a different rule from the pattern of statutes and precedent. It contends that parents may not recover damages for loss of society unless they prove that they were dependent on their deceased child.[13] The government relies in part on the following language from a footnote in *Higginbotham:*

It remains to be seen whether the difference between awarding loss-of-society damages under *Gaudet* and denying them under DOHSA has a great practical significance. It may be argued that the competing views on awards for loss of society ... can best be reconciled by allowing an award that is primarily symbolic, rather than a substantial part of the survivors' recovery. We have not been asked to rule on the propriety of the large sums that the District Court would have awarded for loss of society in this case.

12. The deficiency in state law became particularly acute with regard to claims based on unseaworthiness. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 25–26, 111 S.Ct. 317, 321–22, 112 L.Ed.2d 275 (1990).

13. The plaintiffs assert that even if dependency must be shown for loss-of-society damages to be available, the record amply supports a finding that the decedents' parents were "dependents" of the decedents. Because we do not find any requirement that dependency be shown for the loss of society awards to stand, we do not address this issue.

*Higginbotham,* 436 U.S. at 624–25 n. 20, 98 S.Ct. at 2014 n. 20. The government also relies on the emphasis on uniformity that pervades both *Higginbotham* and *Miles,* as well as the statement in *Miles* that "an admiralty court should look primarily to [state and federal] legislative enactments for policy guidance." *Miles,* 498 U.S. at 27, 111 S.Ct. at 323. From these pronouncements, the government extracts a rule that, in the interest of uniformity between DOHSA and Jones Act on the one hand and the law applicable to territorial waters on the other, would permit recovery for loss of society only to parents who were dependent upon their decedents.

We are not convinced by the government's reasoning. The footnote in *Higginbotham* is indicated in a sentence of text that makes the Supreme Court's position clear:

It is true that the measure of damages in coastal waters will differ from that on the high seas, but *even if this difference proves significant,* a desire for uniformity cannot override the statute.

*Higginbotham,* 436 U.S. at 624, 98 S.Ct. at 2014. (footnote omitted) It is clear enough from this statement in *Higginbotham* that the Court left the law applicable to territorial-water *Moragne* actions where it found it. Its limitation of recovery under DOHSA was simply dictated by Congress, resulting in non-uniformity. The same considerations applied in *Miles.* The Court stated that it was not free to grant damages that might otherwise serve the humane and liberal purposes of admiralty because "[w]e sail in occupied waters.... Congress has placed limits on recovery in survival actions that we cannot exceed. *Because this case involves the death of a seaman,* we must look to the Jones Act." *Miles,* 498 U.S. at 36, 111 S.Ct. at 327–28 (emphasis added). Thus, the results in *Higginbotham* and *Miles* were clearly dictated by statute, and neither statute limits the damages recoverable for death in

territorial waters that were authorized by *Gaudet.*

The government points out that the Second, Fifth and Sixth Circuits have adopted the government's position,[14] but we are not persuaded by their reasoning, either. The decision most thoroughly discussing the issue is that of the Second Circuit, in its recent case, *Wahlstrom v. Kawasaki Heavy Indus., Ltd.,* 4 F.3d 1084 (1993). In *Wahlstrom,* the court first ruled that the district court erred in adopting a parental dependency requirement for *any* type of recovery in *Moragne* actions. 4 F.3d at 1090–91. In rejecting the district court's blanket dependency requirement, the court relied upon the DOHSA schedule of beneficiaries found at 46 U.S.C.App. § 761. *Id.* (noting *Moragne's* admonition that lower courts use DOHSA as a guide in fashioning the newly established general maritime wrongful death cause of action). The court stated that DOHSA's authorization of suits " 'for the exclusive benefit of the decedent's wife, husband, parent, child or dependent relative' ... indicat[es] that a parent need not be a dependent of the decedent to have standing to recover some damages." *Id.* at 1090. With this reasoning, we agree.[15] Indeed, we would stop there because: (1) *Gaudet* instructs that loss-of-society damages are available for *Moragne* wrongful death actions not covered by either DOHSA or the Jones Act; (2) Federal courts typically rely upon the DOHSA schedule of plaintiffs in determining standing to bring a *Moragne* wrongful death action. Parents, dependent or not, are therefore entitled to loss-of-society damages.

The Second Circuit went on, however, to hold that DOHSA's provision limiting recovery under the Act to pecuniary damages, 46 U.S.C.App. § 762, necessitates further analysis of what *Moragne* damages are available. It then held that the interests of uniformity, and the notion that recovery for death of a

---

**14.** *Wahlstrom v. Kawasaki Heavy Industries, Ltd.,* 4 F.3d 1084, 1090–93 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1060, 127 L.Ed.2d 380 (1994); *Miles v. Melrose,* 882 F.2d 976, 989 (5th Cir.1989), *aff'd sub nom. Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); *Anderson v. Whittaker Corp.,* 894 F.2d 804, 811–12 (6th Cir.1990).

**15.** Indeed, for many years, "in determining the proper beneficiaries under *Moragne,* the courts have looked first to the federal maritime death statutes for guidance [and] have concluded, in keeping with the spirit of *Moragne,* that the collective schedule of beneficiaries provided for under DOHSA should control." 2 Benedict on Admiralty § 83b at 7–55 (7th ed. rev. 1993).

seaman in territorial waters should not be less generous than recovery for death of a non-seaman, required a denial of loss-of-society benefits to non-dependent parents.

We do not consider ourselves free to give such weight to the interest of uniformity,[16] in light of *Gaudet's* explicit acknowledgement that it was creating a non-uniform category of damages in territorial waters, *Gaudet*, 414 U.S. at 588 n. 22, 94 S.Ct. at 816 n. 22, and the acknowledgements of non-uniformity in *Higginbotham*, 436 U.S. at 624, 98 S.Ct. at 2014. The fact that the death of a seaman in territorial waters leads to recovery only of pecuniary damages is dictated by statute, *Miles*, 498 U.S. at 32–33, 111 S.Ct. at 325–26, and that statute does not limit recoveries for the deaths of non-seamen.

We also do not consider controlling the Supreme Court's use of the word "dependents" at various points in *Gaudet*. *Cf. Wahlstrom*, 4 F.3d 1084 (noting instances). We view these references merely as descriptive of the parties before the court in that case, not as a restriction on the Court's holding that loss-of-society damages are available in *Moragne* actions.[17] The *Gaudet* Court simply was not faced with the precise issue before us today, which in our view is whether these parents are proper *Moragne* plaintiffs, entitled to recover the usual elements of damages available to such plaintiffs.[18] *Gaudet* focuses upon loss of society as an element

of *Moragne* action damages, not on the schedule of beneficiaries.[19]

We decline, therefore, to limit *Gaudet* by drawing an unnecessary distinction between dependent and nondependent parent plaintiffs in *Moragne* actions for determining the availability of loss-of-society damages. As the Court noted in *Moragne*, "it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rules." *Moragne*, 398 U.S. at 387, 90 S.Ct. at 1781 (quoting *The Sea Gull*, 21 F.Cas. 909, 910 (No. 12,578) (C.C.Md.1865)). Any lack of uniformity that is evidenced by our ruling inheres in the decision of the Supreme Court in *Gaudet* and in the actions of Congress in enacting DOHSA and the Jones Act. We are in no position to disregard or modify either of those authorities, even if we were of such a mind. We therefore affirm the district court's award of loss-of-society damages without regard to dependency.

### B. Calculation of Damage Awards

The district court awarded Marie Katz, mother of Ronald Meyers, $500.00 per year for loss of support, $800.00 per year for loss of services and $10,000.00 per year for loss of society. These amounts were multiplied by Ronald's life expectancy of 50.5 years and discounted to present value using a 4% discount rate. The court awarded identical an-

---

**16.** The degree to which the Second Circuit has achieved uniformity is limited, because dependent parent plaintiffs under DOHSA and the Jones Act (as well as all other plaintiffs in those statutory causes of action) remain confined to pecuniary damages, whereas dependent parent plaintiffs in *Moragne* actions (as well as all other proper *Moragne* plaintiffs, except nondependent parents) still can recover loss-of-society damages.

**17.** We also note that the Court itself chose to use the word "survivors," not "dependents," when characterizing the *Gaudet* plaintiffs in *Higginbotham*, 436 U.S. at 622 & n. 15, 98 S.Ct. at 2013 & n. 15 ("Among the issues addressed in *Gaudet* was the measure of *survivors'* damages.") (emphasis added).

**18.** As the Second Circuit itself acknowledged, "an essentially pecuniary standard such as dependency should not provide the dividing line on

this issue, given the nature of loss-of-society damages." *Wahlstrom*, 4 F.3d at 1092; *see also*, *Rollins v. Peterson Builders, Inc.*, 761 F.Supp. 918, 923 (D.R.I.1990) ("The degree to which the beneficiary depends on the decedent's financial contribution simply has no bearing on the amount of damages the beneficiary can recover for the loss of the decedent's society.")

**19.** We also do not consider controlling the statement in *Miles* that "[t]he holding of *Gaudet* ... applies only to longshoremen." 498 U.S. at 31, 111 S.Ct. at 325. The point that the Court was making was that *Gaudet* does not apply to seamen. As the Court earlier recognized, "*Moragne* intended to create a general maritime wrongful death action applicable beyond the situation of longshoremen." *Id.* at 30, 111 S.Ct. at 324. Indeed, the government concedes that the rule of *Gaudet* is not confined to longshoremen when it agrees that *dependent* parents may recover loss-of-society damages in *Moragne* actions.

nual amounts for each type of loss to the parents of Patricia Hulings, John Bakos, Kathy Weaver and Anthony Sutton. In determining these awards, the court varied only the life expectancy figures.[20] The government asserts that the district court erred both in its identical annual damage figures, and in basing its awards on the life expectancies of the decedents rather than on the presumably shorter life expectancies of the parents.

### 1. Consistency of the Awards.

 We review the district court's computation of damages under the clearly erroneous standard. *Lum v. Honolulu,* 963 F.2d 1167, 1170 (9th Cir.1992); *Yako v. United States,* 891 F.2d 738, 745 (9th Cir.1989). We generally will not remand a damages determination so long as "'the evidence shows the extent of damages a matter of just and reasonable inference, although the result may be only approximate.'" *Frito–Lay, Inc. v. Local 137, Int'l Bhd. of Teamsters,* 623 F.2d 1354, 1364 (9th Cir.1980).

 The government contends that the district court's use of identical annual amounts for each of the five survivors alone establish that the awards were clearly erroneous. According to the government, "human nature does not justify an assumption, such as the one obviously made by the Court below, that five individuals, of different backgrounds, would each treat their parents, all in different economic and social environments, identically." This assertion very well may be true and probably would require reversal of the damage awards if we required damage awards to be made with mathematical certainty. We do not. The question is whether the amounts are grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork. *See City of Vernon v. Southern Cal.*

*Edison Co.,* 955 F.2d 1361, 1371 (9th Cir. 1992); *Stinnett v. Damson Oil Corp.,* 813 F.2d 1394, 1397 (9th Cir.1987).

The awards were not grossly excessive or monstrous. The total present value awards for future losses were: Ronald Meyers's mother, $243,595.00; Patricia Hulings's mother, $255,154.00; John Bakos's mother, $246,453.00; Kathy Weaver's mother, $250,521.00; and Anthony Sutton's mother, $235,944.00. In light of our holding below that the district court erred in utilizing the decedents' rather than the survivors' life expectancies, these awards will be reduced. Even prior to such reduction, however, we cannot say that the awards are "grossly excessive or monstrous."

Neither are the awards "clearly not supported by the evidence." The parents of the decedents submitted declarations regarding past services and contributions they had received from the decedents. The parents also testified regarding the elements of damages before the court. We are not prepared to say, as a reviewing court, that the annual amounts awarded by the district court were not a reasonable *approximation* of the damages sustained by each parent. The parents' declarations and testimony likewise establishes that the amounts were not "based *only* on speculation or guesswork." *See City of Vernon,* 955 F.2d at 1371 (emphasis added).

### 2. Life Expectancy Figures

 We agree with the government's contention that the district court erred in using the life expectancies of the decedents rather than those of the surviving parents.[21] The purpose of a wrongful death action is to compensate the decedent's survivors for *their* loss. It simply makes no sense to calculate the loss to the parents, who presumably have

---

**20.** The court used 59.4 years to determine the award for Patricia Hulings's mother, 52.4 years for John Bakos's mother, 55.5 years for Kathy Weaver's mother, and 46 years for Anthony Sutton's mother. The court later reduced the amount of the loss of society award to Kathy Weaver's mother by $25,000, awarding this same amount to Kathy Weaver's husband.

**21.** The district court's findings of fact do not specify that the expectancy figures are those of the decedents. The government points out in its brief, however, that the 50.5 life expectancy figure used to compute the award for Ronald Meyers's mother would result in a life expectancy for her of 95 years. The plaintiffs do not dispute the assertion that the figures represent the life expectancies of the decedents. Thus, we consider this issue to have been conceded.

shorter remaining life expectancies at any given time than their children, by the child's life expectancy. *Accord* 3 Marilyn Minzer, et al., *Damages in Tort Actions* § 22.13[2][b] ("Obviously, the beneficiary could not have realized benefits from the deceased beyond his or her own lifetime. The beneficiary's right to recover the value of expected benefits should thus be limited to the period of his or her life expectancy."). Accordingly, we remand to the district court for recalculation of these awards.

### C. Award to Stephen Brennan

■ The district court's original judgment included a damage award to Stephen Brennan that included the following: $322,-672.97 loss of future earnings (present value of $15,573.02 per year for 45 years discounted at 4%), $1,841.80 future medical expenses (present value of $88.99 per year for 45 years discounted at 4%) and $207,200.00 future pain and suffering (present value of $10,000 per year for 45 years discounted at 4%). While *Earles I* was on appeal, Brennan died of causes unrelated to the allision between the WHISKEY RUNNER and Oscar 8. After remand, in its New and Amended Findings of Fact and Conclusions of Law, which we have interpreted to be a new judgment, the district court reinstated the award for Brennan. The government argues that this award, which includes losses the court calculated to be suffered 45 years into the future, cannot be sustained in light of Brennan's death. We disagree.

First, we note that Brennan's representatives are not precluded from continuing his suit after his death; we recognized a general maritime survival action in *Evich v. Connelly,* 759 F.2d 1432, 1434 (9th Cir.1985).[22] In a subsequent appeal of that case, *Evich v. Morris,* 819 F.2d 256, 258 (9th Cir.1987), we also announced the rule for this circuit that, where no wrongful death beneficiaries exist, the decedent's estate can receive an award for loss of future earnings because in such cases, potential problems of double recovery

in the form of loss of support awards to wrongful death beneficiaries do not arise. *Id.* Applying this rule to the undisputed facts of this case, the Brennan award must stand. No potential wrongful death plaintiff can be waiting in the wings ready to subject the government to double-liability because Brennan's death resulted from causes unrelated to the government's negligence.[23]

We do not consider the vitality of *Evich* as applied in the circumstances of this case to have been called into doubt by the Supreme Court's holding that a decedent-seaman's estate may not supplement the remedies of the Jones Act, which preclude recovery for lost future income, through the maintenance of a general maritime cause of action. *Miles,* 498 U.S. at 36, 111 S.Ct. at 327. First, the Court clearly rested its decision in *Miles* on the existence of the Jones Act's limitation on remedies—a limitation not present in this case. *Id.* Moreover, the Court was influenced by the nature of the supplemental general maritime action in that case, an unseaworthiness action, which does not require a finding of fault. *Id.* (The Jones Act limitation of survival remedies for injuries resulting from negligence "forecloses the more expansive remedies in a general maritime action *founded on strict liability.*") (emphasis added).

Not only does *Miles* fail to undermine *Evich,* much of the Court's discussion indicates approval of *Evich,* at least in cases not involving the death of seamen or death on the high seas. For instance, the Court stated that although "the considered judgment of a large majority of American legislatures is that lost future income is not recoverable in a survival action ...[, t]his fact alone would not necessarily deter us." *Id.* at 35, 111 S.Ct. at 327. And the Court noted that "[t]here are indeed strong policy arguments for allowing such recovery." *Id.* at 35–36, 111 S.Ct. at 327 (citing R. Posner, Economic Analysis of Law 176–81 (3d ed. 1986)). Finally, *Evich*'s restriction allowing such recovery only in the absence of wrongful death

---

**22.** Other circuits also have recognized a general maritime right of survival. *See Miles v. Apex Marine Corp.,* 498 U.S. 19, 34–35, 111 S.Ct. 317, 326–27, 112 L.Ed.2d 275 (1990) (listing cases).

**23.** Mr. Brennan died of anoxic encephalopathy stemming from polydrug usage. Appellant's Opening Brief at 47.

beneficiaries addresses what the Court noted to be the probable reason behind the lack of legislative support for these awards—i.e. "Recovery of lost future income in a survival suit will, in many instances, be duplicative of recovery by dependents for loss of support in a wrongful death action." *Id.* at 35, 111 S.Ct. at 327.

We therefore remain committed to the rule announced in *Evich,* where there is no applicable federal wrongful death statute imposing a damage limitation. Survival actions are distinct from wrongful death actions. The former have been developed to abrogate the common-law rule that an action for tort abated at the death of the injured person. *Gaudet,* 414 U.S. at 575 n. 2, 94 S.Ct. at 809 n. 2. The survival action permits the deceased's estate to prosecute claims the injured party would have had but for his death, *id.,* thus avoiding a windfall to the tortfeasor. If Brennan had not died during the prior appeal of this case, he would have received the amount awarded for lost future earnings. This award would have become property of the estate after his unexpected [24] death. Reduction of the award at this point would result in a windfall to Mr. Earles and the government, the tortfeasors in this case. Accordingly, we decline to disturb the district court's award to Stephen Brennan.[25]

### D. Conclusion on Damages

In summary, we hold that (1) the district court did not err in awarding loss-of-society damages to the decedents' parents without first determining whether the parents were dependents of the decedents; (2) the uniformity of the annual amount components of the survivors' awards alone does not establish that the awards were clearly erroneous; (3) the district court did, however, err in using the decedents' life expectancies when calculating the present value of the survivors' awards; (4) the district court did not err in leaving the award to Stephen Brennan undisturbed despite his death during the prior appeal in this case.

### III. Conclusion

Because some of the government omissions upon which the district court rested its determination of government negligence are shielded from tort liability by the SIAA's discretionary function exception, we REMAND to the district court for a determination whether the fifty-fifty apportionment of fault between Mr. Earles and the government remains warranted. In all other respects we AFFIRM the district court finding of government liability. We also REMAND to the district court the future loss elements of the awards to the decedents' survivors because the district court's use of the decedents' life expectancies in calculating these awards was clearly erroneous. In all other respects we AFFIRM the damage awards, subject to any modified apportionment between Mr. Earles and the government that the district court may make.

AFFIRMED in part, REVERSED in part and REMANDED for further proceedings in light of this opinion. Each party will bear its own costs.

---

**24.** The government does not assert that the district court's estimated life expectancy for Mr. Brennan upon which it based the award was clearly erroneous at the time the district court initially made the award.

**25.** The logic of *Evich* regarding future earnings applies with equal force to the other future damage elements of the award to Brennan.