126 F.3d 1205
 97 Cal. Daily Op. Serv. 7617, 97 Daily Journal
D.A.R. 12,274
Niranjan KOIRALA, individually and as personal
representative for the heirs of Santosh Koirala, deceased;
Himanshu Koirala; Bashkar Koirala; The Estate of Thomas
Hill; Anne Guta; The Estate of Kora Guta; The Estate of
Bo Guta; The Estate of Magma Guta; Shanti Rajlawat,
individually and as personal representative for the heirs of
Chandra Bahadur Rajlawat, deceased; Sandeep Rajlawat;
Shiva Rajlawat; Anandi Ramachandran, Plaintiffs-Appellees,
v.
THAI AIRWAYS INTERNATIONAL, LTD., Defendant-Appellant.
Niranjan KOIRALA, individually and as personal
representative for the heirs of Santosh Koirala, deceased;
Himanshu Koirala; Bashkar Koirala; The Estate of Thomas
Hill; Anne Guta; The Estate of Kora Guta; The Estate of
Bo Guta; The Estate of Magma Guta; Shanti Rajlawat,
individually and as personal representative for the heirs of
Chandra Bahadur Rajlawat, deceased; Sandeep Rajlawat;
Shiva Rajlawat; Anandi Ramachandran, Plaintiffs-Appellants,
v.
THAI AIRWAYS INTERNATIONAL, LTD., Defendant-Appellee.
 Nos. 96-16598, 96-16712.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 11, 1997.
Decided Sept. 25, 1997.
 
 Frank A. Silane and Stephen R. Ginger, Condon & Forsyth, Los Angeles, California, for defendant-appellant-cross-appellee.
 Joseph T. Cook, Speiser, Krause, Madole & Cook, Irvine, California, and John S. Preston, Oakland, California, for plaintiffs-appellees-cross-appellants.
 Appeals from the United States District Court for the Northern District of California; Samuel Conti, District Judge, Presiding. . D.C. No. CV-94-02644-SC.
 Before: SCHROEDER and THOMAS, Circuit Judges, and PREGERSON,* District Judge.
 THOMAS, Circuit Judge:
 
 
 1
 On July 31, 1992, Thai Airways International ("Thai Airways") Flight TG-311 crashed into a mountainside while attempting to land at Tribhuvan International Airport in Kathmandu, Nepal, killing all 113 people aboard. In this case, we examine whether the crash was the result of "wilful misconduct" on the part of the flight crew, lifting the Warsaw Convention's $75,000 cap on damages for personal injury. We agree with the district court that it was.
 
 
 2
 * Flight TG-311 was a regularly scheduled flight from Bangkok, Thailand to Kathmandu, Nepal. Tribhuvan International Airport in Kathmandu has the reputation of being one of the most difficult airports in the world in which to land. It is situated in a valley surrounded by very high mountains, requiring a steep approach to land and the full extension of the wing flaps during the entire descent. Kathmandu air traffic control has no radar. Instead, air traffic controllers determine aircraft location and provide instructions to aircraft using air-to-ground and ground-to-air radio communications. Flight TG-311 Captain Preeda Suttimai and First Officer Phunthat Boonyayej (collectively "the flight crew" or "the crew") were properly licensed and certified, and both had substantial experience flying into Kathmandu.
 
 
 3
 On the night of the crash, the weather in Kathmandu was cloudy and rainy. The flight crew had little visibility and were entirely dependent upon navigational instruments to fly the aircraft. At 06:46:07 Coordinated Universal Time, Tribhuvan air traffic control authorized the captain to execute a landing approach. The aircraft was at this time flying at heading 022, twenty-two degrees east of due north. When the crew attempted to configure the airplane for landing, they discovered at 06:47:34 that the wing flaps failed to extend properly, rendering landing too dangerous to attempt. The crew requested permission to divert the aircraft to Calcutta, but before air traffic control responded, the wing flaps extended properly at 06:49:05. By this time, however, the aircraft had traveled too far north and was too high to begin a descent toward the runway.
 
 
 4
 From 06:49:08 until 06:50:21, the captain asked air traffic control four times for clearance to turn left and fly south to point "Romeo," a navigational position approximately forty-one miles south of Tribhuvan International Airport from which the aircraft had made its initial approach, to attempt another landing approach. Although a left turn under these circumstances was a reasonable and safe action for the airplane, air traffic control did not respond to the captain's repeated requests.
 
 
 5
 At approximately 06:50:50, without requesting or obtaining clearance from air traffic control, the flight crew began a climbing right turn. The first officer notified air traffic control at 06:51:55 of the right turn and the crew's intention to climb to 18,000 feet and return to point Romeo. Air traffic control ordered the aircraft to descend to 11,500 feet and maintain that altitude, and the flight crew complied with that instruction.
 
 
 6
 Six separate times from 06:52:06 to 06:59:39, air traffic control authorized the aircraft to head south and return to point Romeo. Instead of turning 180 degrees and heading south on heading 202, as was their stated intention, the flight crew mistakenly turned the aircraft full circle, 360 degrees, and unknowingly continued heading north toward the mountains surrounding Kathmandu on heading 022. From the time the aircraft completed the 360 degree turn, at approximately 06:54:41, the flight crew believed they had executed only a 180 degree turn and were heading south, despite the fact that all the navigational instruments on the instrument panel constantly indicated the northerly heading of the aircraft.
 
 
 7
 The crew had apparently become preoccupied from approximately 06:54:12 with their unsuccessful efforts to input and display the location of point Romeo on the computerized Flight Management System ("FMS"). They were unable to display point Romeo on the FMS because the system was incapable of displaying navigational points located behind the aircraft. As point Romeo was located to the south of the aircraft and the aircraft was heading north, the FMS was unable to display the location of the navigational point. However, the crew believed they were heading south and could not understand why they were unable to display the location of point Romeo on the FMS.
 
 
 8
 The crew continued to attempt to program the FMS and to operate under the misconception that they were heading south for approximately six minutes, until at least 06:59:56. At 06:59:58, the first officer realized the aircraft was heading north and attempted to communicate this fact to the captain, who did not understand the warning. Twenty-eight seconds later, at 07:00:26, the aircraft crashed into the side of a mountain twenty-three miles north of Kathmandu at an altitude of 11,500 feet and a ground speed of 300 nautical miles per hour, killing all ninety-nine passengers and fourteen crew members on board instantly.
 
 
 9
 Relatives of seven of the passengers killed in the crash-Santosh Koirala, Chandra Rajlawat, Thomas Hill, Thomas Guta, and Mr. Guta's three children, Kora Guta, Bo Guta, and Magma Guta-brought an action against Thai Airways pursuant to the Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11, reprinted in 49 U.S.C. § 40105 note (1997) (the "Warsaw Convention" or the "Convention"). Relatives of another passenger, Kandaswamy Ramachandran, also brought an action which was eventually consolidated with the previously filed action.
 
 
 10
 The parties agreed to bifurcate the trial into liability and damages phases. Before either phase commenced, Thai Airways filed a motion to determine the substantive law governing liability and the availability of damages. Relying in substantial part on the Second Circuit's opinion in Zicherman v. Korean Air Lines Co., 43 F.3d 18 (2d Cir.1994), the district court held in an order dated October 11, 1995 that U.S. maritime law would govern the dispute.[1] The court also held, among other things, that only a decedent's spouse and dependents could maintain a wrongful death action.
 
 
 11
 The case was then tried before the district court without a jury, as required by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602-1611 ("FSIA"), pursuant to which the district court exercised subject matter jurisdiction.[2] See 28 U.S.C. § 1330(a). In the liability phase, applying U.S. federal law interpreting the term "wilful misconduct" under the Warsaw Convention, the court found that the crash of Flight TG-311 was the result of the crew's "wilful misconduct" in failing to monitor their navigational instruments which displayed a northerly course for the entire six minutes after the 360-degree turn and before impact.
 
 
 12
 On the strength of the district court's holdings in its October 11, 1995 order determining the applicable law, Thai Airways moved for summary judgment on all claims brought by the surviving relatives of two of the decedents, Thomas Hill and Thomas Guta, arguing that neither had any dependents who could recover damages. In an order dated April 22, 1996, the district court granted the motion with respect to all wrongful death claims except that asserted by Anne Guta, Thomas Guta's mother, finding there was a material issue of disputed fact regarding whether she was dependent upon her son for financial support. Further, relying on Sutton v. Earles, 26 F.3d 903, 919 (9th Cir.1994) and Evich v. Morris, 819 F.2d 256, 258 (9th Cir.1987), the court held that where no wrongful death beneficiaries exist, the decedent's estate can receive an award of loss of future earnings through a survival action. The court therefore held that the estate of Thomas Hill could assert a survival claim because he had no dependents and consequently no wrongful death beneficiaries.
 
 
 13
 In a subsequent order dated June 17, 1996, the court granted the plaintiffs' motion for leave to amend their complaint to assert a survival claim for loss of future earnings on behalf of Hill's estate. The court also rejected Thai Airways' motion for reconsideration of that portion of its April 22, 1996 order allowing a decedent's estate to recover loss of future earnings where no wrongful death beneficiaries exist. The court declined to accept Thai Airways' argument that in cases of instantaneous death, decedents fail to accrue any personal injury cause of action prior to death, precluding their estates from bringing any survival actions on their behalf.
 
 
 14
 The court then proceeded to the damages phase. After a bench trial, the court awarded damages in an order dated July 10, 1996. Because the court found that decedent Santosh Koirala intended to return to her native Nepal after the second of her two sons graduated from college in 1998, where she would not earn any income, the court awarded damages to Koirala's estate using estimated future earnings only until 1998. The court also found that Anne Guta was not financially dependent upon her son Thomas and therefore entered judgment against her in her wrongful death action.
 
 
 15
 The district court entered judgment on August 1, 1996. Thai Airways timely appealed, and the plaintiffs timely cross-appealed.
 
 II
 
 16
 Among other provisions, the Warsaw Convention allows passengers injured or killed in an airplane crash to recover damages from the air carrier:
 
 
 17
 The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.
 
 
 18
 Warsaw Convention art. 17. However, the liability of the carrier for each passenger so injured or killed is limited to $75,000. Warsaw Convention art. 22(1), as modified by Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol, Agreement CAB 18900, approved by Civil Aeronautics Board Order E-23680, 31 Fed.Reg. 7302 (1966), reprinted in 49 U.S.C. § 40105 note (the "Montreal Agreement"); Gezzi v. British Airways PLC, 991 F.2d 603, 604 n. 2 (9th Cir.1993). There is an exception to this limit where the damage has been caused by the carrier's "wilful misconduct":
 
 
 19
 The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.
 
 
 20
 Warsaw Convention art. 25(1).
 
 
 21
 "Wilful misconduct under the Convention means the intentional performance of an act with knowledge that the ... act will probably result in injury or damage or the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences." Johnson v. American Airlines, Inc., 834 F.2d 721, 724 (9th Cir.1987) (internal quotation marks omitted) (alteration in original). The intentional omission of an act may also support a finding of wilful misconduct. Ospina v. Trans World Airlines, Inc., 975 F.2d 35, 37 (2d Cir.1992).
 
 
 22
 We have not previously had occasion to determine the appropriate standard of review for a district court's finding of wilful misconduct under the Warsaw Convention. The existence of wilful misconduct is a mixed question of fact and law. Perera Co. v. Varig Brazilian Airlines, Inc., 775 F.2d 21, 23 (2d Cir.1985). As such, it may be subject either to clear error or de novo review, depending upon "the concerns of judicial administration." United States v. McConney, 728 F.2d 1195, 1202 (9th Cir.1984) (en banc). Here, the concerns of judicial administration counsel in favor of a clearly erroneous standard because wilful misconduct must inevitably be determined "by reference to the data of practical human experience." McConney, 728 F.2d at 1204 (internal quotation marks omitted). Assessment of state of mind is essentially a factual inquiry, better suited for district court examination. Id. at 1203. District courts are inherently better positioned to make such judgments because of their superior vantage point to the evidence. Thus, this is the type of inquiry which presents an exception to the rule of de novo review of mixed questions of fact and law. Id.
 
 
 23
 Moreover, the few cases which reference the issue support application of the clearly erroneous standard of review. See Saba v. Compagnie Nationale Air France, 78 F.3d 664, 670 (D.C.Cir.1996) (suggesting district court's finding of wilful misconduct under Warsaw Convention will be upheld unless clearly erroneous); Perera, 775 F.2d at 23 (same); Berguido v. Eastern Air Lines, Inc., 369 F.2d 874, 880 (3d Cir.1966) (same).
 
 
 24
 Thus, we will review the district court's finding of wilful misconduct under the Warsaw Convention for clear error. Under this standard, we must uphold the district court's decision unless, after reviewing the decision, we are left with a "definite and firm conviction that a mistake has been made." David H. Tedder & Assocs., Inc. v. United States, 77 F.3d 1166, 1169-70 (9th Cir.1996).
 
 
 25
 The issue in this case is whether it was wilful misconduct for the crew to have failed to discern anytime during the six minutes after the 360-degree turn and before impact that the plane was heading north into known dangerous terrain instead of south. This was the rationale upon which the district court based its finding of wilful misconduct. We hold the district court did not clearly err in finding wilful misconduct under the circumstances of this case.
 
 
 26
 Although Thai Airways argues for a subjective standard in evaluating the flight crew's performance and the plaintiffs for an objective one, Johnson supplies the definition of wilful misconduct to be used in Warsaw Convention cases under the law of the Ninth Circuit: the crew must intentionally perform an act with knowledge that the act will probably result in injury or damage or intentionally perform an act in such a manner as to imply reckless disregard of the probable consequences. Johnson, 834 F.2d at 724.
 
 
 27
 Thai Airways argues Berner v. British Commonwealth Pac. Airlines, Ltd., 346 F.2d 532 (2d Cir.1965) is on point and supports its position. In that case, the court held that if the plane crashed into a mountain because the pilot for some unknown reason became confused as to his actual position and began landing procedures at an improper time which he mistakenly thought was proper, "wilful misconduct would not have been established under any standard." Berner, 346 F.2d at 537-38. Thai Airways argues there is no evidence the crew did not look at their instruments, no evidence that if they did fail to look at their instruments, they did so consciously, and no evidence that intentional misconduct is more likely than any other possible explanation for the crew's behavior, such as inadvertence or even negligence. Thai Airways insists that all the evidence shows that accumulated stress and workload from flying in dangerous territory and poor weather conditions, with an equipment failure, becoming preoccupied with their unsuccessful attempts to program the FMS, and with no ground radar and unhelpful air traffic controllers, rendered the crew incapable of recognizing that their navigational instruments indicated the aircraft was heading north rather than south. This is particularly true given that the desired course heading was 202 rather than 022, numbers which are easily transposed and confused, and which David McNair, the chief accident investigator for the Government of Nepal, in fact testified he and the other accident investigators transposed and confused in the calm of the flight simulator.
 
 
 28
 This might all very well be so. However, as stated in Berner, resolution of this case "depend[s] upon inferences to be drawn from essentially circumstantial evidence." Berner, 346 F.2d at 538. Indeed, "subjective standards are nearly always satisfied by circumstantial proof." Eastwood v. National Enquirer, Inc., 123 F.3d 1249, 1256 n. 20 (9th Cir.1997). Here, the district court judge could have determined from the evidence that frequently checking navigational instruments to verify heading is a task so fundamental to basic flying safety, the sheer fact the crew for nearly six minutes did not realize they were flying in the wrong direction indicates they must consciously have ignored this duty. Consciously ignoring this duty while flying in a notoriously mountainous area certainly "impl[ies a] reckless disregard of the probable consequences." Johnson, 834 F.2d at 724 (internal quotation marks omitted).
 
 
 29
 Captain Donald Lykins, an expert witness for the plaintiff, testified that "a flight crew looks at their instruments, just scans them; probably they're going by an instrument every few seconds." He opined that the flight crew's actions in this case were "completely substandard of any scheduled airlines in the world" because they ignored plainly visible compass readings indicating a wrong heading for a substantial amount of time. Another plaintiffs' expert, Captain Barry Schiff, stated that "[t]o think that a professional crew can go for six minutes without being aware where they were going is almost incomprehensible." He further testified:
 
 
 30
 Question: What are the normal or expected instrument flying procedures that you would expect a crew to utilize after they had performed the 360-degree turn and were heading northbound? What are the normal procedures you would expect a crew to do or to perform in order to comply with the attitude, altitude and heading requirements you just identified?
 
 
 31
 Answer: Well, it's something that we teach the very basic new instrument students. We teach them how to scan their instruments, and it's something that a pilot learns from the very beginning. He has before him a matrix of instrumentation which tells him whether the airplane's attitude is proper, whether the heading is proper, whether the altitude is proper, and it's up to him to constantly scan these instruments. And of course, he has other things to do. He can look away, do something, come back, and look at those instruments again, but to ignore them for six minutes, I can't understand how they could allow that to happen.
 
 Captain Schiff also testified:
 
 32
 I believe they did get disoriented, but they did have ample time to resolve that disorientation. Six minutes is a horrendous amount of time.... That's a terribly long period of time for a crew not to be looking at their direction.... They were disoriented, probably distracted, but nevertheless, that doesn't absolve them of their responsibilities to monitor what the aircraft is doing at all times.
 
 
 33
 In response to a direct question whether the crew checked the instruments during the six-minute flight prior to the crash, Captain Supachoke, a Thai Airways expert witness, testified that he could not know if the flight crew checked their instruments or not, undermining other witnesses' testimony to the contrary.
 
 
 34
 The official accident report produced by the Government of Nepal in general seems to support Thai Airways' argument that the accident was caused by the crew reaching human limitations in dealing with stress and workload, but not to the extent that the district court clearly erred in finding wilful misconduct. For instance, the report indicates that "use of the autoflight systems [after the 360-degree turn] to control the aircraft ... meant that there would have been reduced instrument cross-check, including the compasses, by the crew." Further:
 
 
 35
 The FMS workload was high and it is possible that at some points of the final portions of the flight the crew could have lost awareness of time and the flight's trajectory. It is not known why the crew would have continued to use the FMS for turning back southward, instead of relying on the other available aircraft navigation information.
 
 
 36
 In view of the cumulative trial evidence, we cannot say the district court clearly erred in finding that the crew acted in conscious and reckless disregard of their duties, constituting wilful misconduct under the Warsaw Convention. Compare In re Korean Air Lines Disaster of Sept. 1, 1983, 156 F.R.D. 18, 24 (D.D.C.1994), aff'd per curiam, 52 F.3d 1122 (D.C.Cir.1995) (jury's finding of wilful misconduct supported because "the nature and extent of the deviation suggested that either the crew flew through Soviet airspace intentionally or that they repeatedly ignored fundamental and mandated navigational safety procedures which, if followed, would have alerted the crew to Flight 007's course deviation").
 
 III
 
 37
 * Contrary to Thai Airways' assertion, the district court did not err in granting the plaintiffs leave to amend their complaint to assert a survival claim for loss of future earnings on behalf of the estate of Thomas Hill. The district court held that where no wrongful death beneficiaries exist, the decedent's estate can receive an award of lost future earnings through a survival action even when in a case of virtually instantaneous death.
 
 
 38
 The court arrived at its conclusion by reasoning from two cases: Evich v. Morris, 819 F.2d 256 (9th Cir.1987) and Sutton v. Earles, 26 F.3d 903 (9th Cir.1994). In Evich, we held that loss of future earnings may be recovered in maritime survival actions where the decedent has no wrongful death beneficiaries. Evich, 819 F.2d at 258. We reasoned that awarding such damages in a survival action " 'better becomes the humane and liberal character of proceedings in admiralty' and prevents the anomaly of rewarding a petitioner for killing his victim rather than injuring him." Id. (quoting Moragne v. States Marine Lines, Inc., 398 U.S. 375, 387, 90 S.Ct. 1772, 1781, 26 L.Ed.2d 339 (1970)) (citations omitted). Further, where wrongful death beneficiaries do not exist, there are no potential problems with double recovery. Id.
 
 
 39
 In Sutton, we reaffirmed Evich, holding that a non-seaman's estate could maintain an action for loss of future earnings where there were no potential wrongful death plaintiffs because the non-seaman died from causes unrelated to the maritime accident. Sutton, 26 F.3d at 919-20. We expressly held that Miles v. Apex Marine Corp., 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) did not undermine Evich where the decedent was a non-seaman, reasoning that Miles held only that "a decedent-seaman's estate may not supplement the remedies of the Jones Act, which preclude recovery for lost future income, through the maintenance of a general maritime cause of action." Sutton, 26 F.3d at 919. We considered Miles to be confined to cases involving seamen or where the death occurred on the high seas. Id. See Davis v. Bender Shipbuilding & Repair Co., 27 F.3d 426, 427 (9th Cir.1994) (Miles overruled Evich with respect to survival actions asserted by seamen's estates).
 
 
 40
 Hill was a non-seaman who did not suffer injury on the high seas. Evich and Sutton therefore allowed his estate to assert a survival action for the loss of his future earnings. That his death was instantaneous does not change this conclusion, for there is no requirement in the law applicable to this case that the deceased live for any amount of time after the injury to maintain a survival action. Sutton, 26 F.3d at 920; Evich, 819 F.2d at 258. Accordingly, the district court did not err in allowing the estate of Thomas Hill to assert a survival claim for loss of future earnings.
 
 B
 
 41
 Similarly, contrary to plaintiffs' assertions, the district court did not err in finding that Anne Guta was not financially dependent upon her son Thomas and was therefore not entitled to maintain a wrongful death action.
 
 
 42
 Anne Guta testified at trial that Thomas never told her he would provide for her, and she never asked him for money. Although Thomas paid for his mother's groceries when he visited her, this was true for all Thomas's siblings. The court properly excluded testimony concerning gift rugs for lack of foundation.
 
 
 43
 There was testimony that the Guta family had a history of children providing financial support for elderly parents. This testimony and the other evidence would have supported a decision to award Anne Guta wrongful death benefits. See Saavedra, 93 F.3d at 554 (substantial evidence supports jury verdict that decedent passenger's parents had a reasonable expectation of future financial support because parents expected support from their children as they aged, and such support from children is expected in Japanese culture). However, we review a district court's findings of fact concerning an award of damages for clear error. Bergen v. F/V St. Patrick, 816 F.2d 1345, 1347 (9th Cir.1987), modified, 866 F.2d 318 (9th Cir.1989). Given the conflicting evidence, the district court did not clearly err in finding Anne Guta was not dependent on her son and granting judgment against her in her wrongful death action.
 
 
 44
 The district court also correctly denied plaintiffs permission to amend their complaint to add a survival action on behalf of the estate of Thomas Guta after the plaintiffs had rested their case. We review the district court's denial of a motion to amend the complaint for an abuse of discretion. Janicki Logging Co. v. Mateer, 42 F.3d 561, 563 (9th Cir.1994). The district court did not abuse its discretion by finding the proffered substantive amendment untimely.
 
 C
 
 45
 The district court did not clearly err in limiting the damage award to Santosh Koirala. Koirala was living in San Pablo, California at the time of the crash, working two jobs to support herself, her husband Niranjan, who had returned to their native Nepal to serve in the government for a nominal salary,[3] and their two sons. Because the district court found that Koirala intended to return to Nepal to live with Niranjan after the younger of their two sons graduated from college in 1998, where she would not earn any income, the court awarded damages to Koirala's estate using estimated future earnings only until 1998.
 
 
 46
 The district court's finding rested on deposition testimony of Koirala's sister, Bidya Pradham:
 
 
 47
 Question: Did she [Koirala] ever have an intention to become a naturalized U.S. citizen like yourself?
 
 
 48
 Answer: No. She did not have intention of becoming a citizen, either. She eventually wanted to go back to Nepal. That's what she had told me. But she wanted to live in this country until the boys were through with their education. I mean, she wanted to make sure that they were on their way to college, university. Then she would go back home. She eventually wanted to go back home, but she wanted to stay here for four or five more years until the boys were on their way. That's what she had told me.
 
 
 49
 Plaintiffs argue that other objective evidence pointed to Koirala's intention to remain in the United States at least until she retired at the age of sixty in the year 2010. They point to the following to prove their case: (1) Koirala made efforts to obtain green cards for her elderly parents to bring them to the United States, where they would enjoy more advanced medical care, suggesting she herself intended to remain in the United States to be near them; (2) she enjoyed life in the United States, particularly the employment opportunities and expanded freedom for women unavailable in Nepal; (3) her husband's trial testimony that they never thought about going back to Nepal permanently; (4) her sister's trial testimony that Koirala was going to work in the United States at least until age sixty; (5) her older son Himanshu was studying multi-media and computer graphics subjects in a California community college, areas in which there are no job opportunities in Nepal, and intended to live and work in the United States; and (6) her younger son Bashkar planned to complete undergraduate and graduate school in the United States and, like Himanshu, was committed to living here permanently. The plaintiffs argue Koirala would have remained in the United States to be near her children.
 
 
 50
 Although these reasons are compelling, we cannot say that the district court clearly erred in its determination. The district court was able to assess witness credibility firsthand and was entitled to rely on the deposition testimony and the fact that nobody could have known in 1990, when Niranjan returned to Nepal, that his uncle would not remain prime minister for some time after Koirala's children had graduated from college. Thus, although the evidence as to the probability of Koirala's return was far from overwhelming, the district court did not commit reversible error in limiting damages.
 
 IV
 
 51
 We affirm the district court's opinion in its entirety. The court did not clearly err in finding that the crash of Flight TG-311 was due to the "wilful misconduct" of its crew. Nor did the court err in allowing the estate of Thomas Hill to assert a survival claim because he had no wrongful death beneficiaries. The court also did not err in finding that Anne Guta was not financially dependent upon her son Thomas and dismissing her wrongful death suit, refusing to permit the estate of Thomas Guta to amend the complaint to assert a survival claim, and calculating the loss of future earnings for decedent Santosh Koirala assuming she would return to Nepal in 1998.
 
 AFFIRMED
 
 
 *
 Honorable Dean D. Pregerson, United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 Zicherman was subsequently overruled by the Supreme Court in Zicherman v. Korean Air Lines Co., 516 U.S. 217, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). Although the parties disagreed on the law governing this action in the district court, neither party appealed the district court's determination and both agree on appeal that U.S. maritime law applies. While the Supreme Court's opinion in Zicherman may alter this analysis, no party has raised this issue and we decline to decide Zicherman 's applicability sua sponte on appeal
 
 
 [2]
 The FSIA creates a statutory presumption that a foreign sovereign is immune from suit unless one of the exceptions to immunity enumerated in 28 U.S.C. §§ 1605 to 1607 applies. 28 U.S.C. § 1604; Export Group v. Reef Indus., Inc., 54 F.3d 1466, 1469 (9th Cir.1995). Thai Airways is a foreign sovereign as that term is defined in the FSIA because the government of Thailand owns a majority of the shares of Thai Airways stock. 28 U.S.C. § 1603(b)(2). The district court found jurisdiction proper under 28 U.S.C. § 1605(a)(2), the commercial activity exception to immunity
 
 
 [3]
 Niranjan apparently moved back to Nepal at the request of his uncle, who had become Prime Minister of Nepal in 1990 when his party came to power. The plaintiffs claim that Niranjan intended to return to the United States after his uncle's service ended, which happened in 1993, when his uncle's party lost power