228 F.3d 964 (9th Cir. 2001)
 PLUMBER, STEAMFITTER AND SHIPFITTER INDUSTRY PENSION PLAN & TRUST, PLUMBERS, STEAMFITTERS & SHIPFITTERS INDUSTRY HEALTH & WELFARE TRUST; LOCAL 290 PLUMBER, STEAMFITTER & SHIPFITTER INDUSTRY RETIREE HEALTH TRUST; LOCAL 290 PLUMBING & PIPEFITTING INDUSTRY JOURNEYMAN
& APPRENTICESHIP TRAINING FUND; LOCAL 290 GAS DISTRIBUTION EMPLOYEES VACATION TRUST; UNITED ASSOCIATION UNION LOCAL 290 PLUMBERS, STEAMFITTER & SHIPFITTER INDUSTRY SCHOLARSHIP FUND; PLUMBING & PIPEFITTING MANAGEMENT TRUST FUND; PIPING INDUSTRY CONTRACT ADMINISTRATION FUND, Plaintiffs-Appellees,
v.
SIEMENS BUILDING TECHNOLOGIES INCORPORATED, a Delaware corporation, fka Landis & taefa, Inc., Defendant-Appellant.
 No. 99-35758
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted July 13, 2000
Filed October 3, 2000
 
 Edwin C. Thomas, III, David M. Novak, Bell, Boyd & Lloyd, Chicago, Illinois, for the defendant-appellant.
 Darrell L. Cornelius, Portland, Oregon, for the plaintiffs
 Appeal from United States District Court for the District of Oregon; John Jelderks, Magistrate Judge, Presiding. D.C. No. CV 97-00779-JJ
 Before: Alfred T. Goodwin, Susan P. Graber, and William A. Fletcher, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 This appeal probes the legal question whether a collective bargaining agreement covers certain employees, and the fact question whether the trustees of an ERISA employee benefits plan had a legitimate purpose to audit certain payroll records of the Appellant employer's operations, as the trustees claim, or were being used by a trade union, as the employer claims, to increase union membership by establishing that union work was being performed by nonunion employees.
 
 
 2
 The trial court took testimony and examined documents and concluded that the collective bargaining agreement was intended to define covered employees as all employees performing the work of installing and maintaining heating, cooling, and ventilation systems, as a legal matter of contract interpretation, and then found, as a fact, that the trustees had a legitimate trust purpose of making certain that the employer was contributing all the funds required by the collective bargaining agreements and the terms of the various trust instruments.
 
 
 3
 The employer contends on appeal that the trial court erred as a legal matter in construing the collective bargaining agreement, and clearly erred as a matter of fact in finding that the purpose of the requested audit was the permissible purpose of protecting and enhancing the trust for the benefit of the beneficiaries and not the covert purpose of providing leverage for the organizational objectives of expanding the jurisdiction of the union over work done by the nonunion employees in the appellant's workforce.
 
 BACKGROUND
 
 4
 In order to analyze the contending theories on appeal, it is necessary to look at some historical background.
 
 
 5
 Defendant Siemens engages, nationwide, in engineering, installation, repair, and servicing of heating, ventilating, and air conditioning systems for commercial and industrial clients. The plaintiffs in this case are the trustees of six multi-employer employee benefit plans.
 
 
 6
 Historically, most of Siemens's labor was performed by unionized workers in the plumbing, steamfitting, and related trades. Accordingly, Siemens is a party to a series of collective bargaining agreements ("CBAs") with an international labor union of plumbers and pipefitters. These CBAs (the "National Agreements") contain work jurisdiction provisions and general terms relating to wages, hours worked, working conditions, fringe benefits, etc. The National Agreements required Siemens to enter into agreements with local unions to set wage and benefits rates according to local standards. The National Agreements also bound Siemens to various trust documents with respect to employee benefit plans. The trust documents involved in this case allow the trustees to audit Siemens's records to ensure compliance with the contribution terms.
 
 
 7
 Evolving sophistication of electronic controls for such systems has reached the point where specialists trained in the installation and adjustment of computerized controls are needed in addition to traditional plumbing and pipe fitting workers to accomplish the installations demanded by the customers Siemens seeks to attract and retain. Siemens has employed a substantial number of nonunion computer-trained specialists and has contended that, because these workers are neither apprentices nor journeymen plumbers or pipefitters, Siemens has no duty to account for them, to make payroll deductions for them, or to contribute to the Trusts on their behalf. The systems specialists are not union members and do not pay union dues, and Siemens does not make fringe benefit contributions to the Trusts on their behalf.
 
 
 8
 The trustees contend that anyone doing the general type of work defined in the work jurisdiction clause, including the installation and maintenance of the employer's systems, is doing the work of apprentices and journeymen and is therefore a covered employee within the meaning of the CBA and, therefore of the trust instruments.
 
 
 9
 In 1992, Local 290 tried to unionize the systems specialists, but failed. The contentious nature of the audit and this litigation has its roots in a history of jurisdictional grievances and failed unionization efforts.
 
 
 10
 Each of the Trusts is governed by an eight-member board, with four members representing employees and four members representing employers. The trustees meet every three months. For the periods between meetings, interlocutory authority is delegated to a two-person standing committee. The standing committee consists of Frank Quinn, an employer representative, and Matt Walters, an employee representative. Each has served on the standing committee for more than eleven years.
 
 
 11
 Employer audits come in four varieties: initial one-year audits, random audits, termination audits and trouble audits. The audit at issue in this case is a trouble audit. The trustees may initiate a trouble audit when they have reason to believe that an employer has failed to make all required contributions.
 
 
 12
 The systems specialists became the center of trustee attention when Walters received information that systems specialists were doing work within the work jurisdiction of plumbers and pipefitters. Walters suggested, and Quinn concurred in, a trouble audit to determine whether contributions were owed to the Trusts and whether union dues were owed to Local 290 by or on behalf of any employee or group of employees. The "true" motivation or purpose of the audit was vigorously litigated before the trier of fact.
 
 
 13
 The Trusts formally requested an audit, and a CPA named Sutton was selected to perform the audit. Siemens contends that Local 290's participation in the audit and the focus on the systems specialists were concealed when the audit was initiated. During the early stages of the audit, Siemens became aware of the attention being paid to the systems specialists and resisted the auditor's efforts to obtain documents related to the specialists. Siemens suspected that Local 290 was attempting to gather information on the work performed by the systems specialists in an attempt to aid unionization efforts.
 
 
 14
 Local 290 then withdrew from the audit process. Union lawyer and Trusts trustee Buckley attempted to draft a confidentiality agreement that would permit completion of the audit. The negotiations with respect to the confidentiality agreement broke down, and the Trusts brought this action to compel Siemens to produce the requested information. As noted, the magistrate judge found in favor of the Trusts and awarded attorney fees to the Trusts.
 
 STANDARD OF REVIEW
 
 15
 The factual findings of the trial court are reviewed for clear error. See Russian River Watershed Protection Comm'n v. Santa Rosa, 142 F.3d 1136, 1140 (9th Cir. 1998). Under the clear error standard, reversal is appropriate only when, after reviewing the record, the reviewing court is left with a definite and firm conviction that a mistake has been made below. See Koirada v. Thai Airways Int'l, Ltd., 126 F.3d 1205, 1213 (9th Cir. 1997). Questions of law are reviewed de novo. See Saltarelli v. Bob Baker Group Med. Trust, 35 F.3d 382, 385 (9th Cir. 1994) (citing Brooker v. Desert Hosp. Corp., 947 F.2d 412, 415 (9th Cir. 1991)). The interpretation of contracts applied to the facts also is reviewed de novo. See Carpenters Pension Trust Fund v. Underground Constr. Co., Inc. , 31 F.3d 776, 778 (9th Cir. 1994) (citing L.K. Comstock & Co. v. United Eng'rs & Constructors, Inc., 880 F.2d 219, 221 (9th Cir. 1989)).
 
 ANALYSIS
 
 16
 Trustees and other fiduciaries are subject to a strict duty of loyalty imposed by ERISA. A plan fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of providing benefits to participants and their beneficiaries." 29 U.S.C. S 1104(a)(1)(A). The Supreme Court has said that an "audit request would be illegitimate. . . if it were actually an effort by plan trustees to expand plan coverage beyond the class defined in the plans' terms or to acquire information about the employers to advance union goals." Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 571 n.12 (1985). The case went on to hold, however, that plan trustees have broad powers of discovery in aid of their duty to protect and preserve the trust for the benefit of the beneficiaries.
 
 
 17
 Siemens asserts that the magistrate judge erred by ignoring the covert nature of Local 290's instigation of the audit and that, because the target of the audit was concealed, the audit was impermissible. Siemens argues that the improper purpose was confirmed through testimony of the president of Local 290 and by the unwillingness of the Trust to enter a confidentiality agreement to exclude Local 290 from receiving information obtained during the audit. After Local 290 had withdrawn from the audit, Mr. Buckley prepared a confidentiality agreement which said that the "Union and the Trust Funds" decided to audit Siemens to ensure "fringe benefit contributions and union dues were paid." (Emphasis added.) Under that proposed agreement, the auditor would have been allowed to disclose information to Local 290 "to resolve a question about whether fringe benefit contributions and union dues are owed for a particular employee or class of employees." The focus on obtaining new union dues, especially in light of the recently failed attempt to unionize the nonunion employees under scrutiny, does suggest that the trustees' motive might have been more expansive than merely protecting the trust. It is undisputed that Local 290 would benefit from the revelation of information about exactly what work was being done by which workers. The factual issue before the trier of fact was whether that beneficiary effect was incidental to a legitimate audit, or was the dominant covert reason for initiating the audit.
 
 
 18
 In response to Siemens's challenges, the Trusts argue that the Trust Agreements and CBA provide for broad access to documents. The Trusts further argue that there was significant information that systems specialists were engaging in work that came within the work jurisdiction clauses of the CBA and that the Trusts believed that Siemens's failure to report such work would result in under-contributions to the Trusts. The Trusts also contend that under-reporting of contributions depletes plan assets and that this concern is the one that actually motivated the audit request. It is undisputed that the Trusts would benefit if unpaid contributions were discovered. Of course, it is equally undisputed that Local 290 would not reject additions to its dues-paying rolls.
 
 
 19
 After reviewing the evidence, the magistrate judge found that Siemens had "failed to establish by a preponderance of the evidence that plaintiffs instituted the audit in order to further these impermissible goals." In a footnote, the magistrate judge properly noted that the mere fact that Local 290 might benefit from some of the information acquired in the audit does not make the audit impermissible per se. This standard would "condemn[ ] all audits that might tangentially benefit a union." The magistrate judge therefore concluded that an impermissible motive must actually motivate the audit. Impermissible purposes include expanding the plan's coverage, helping Local 290 expand its membership or collect unpaid union dues, establishing violations of the work jurisdiction clauses of CBAs, or otherwise attempting to advance union goals. See Central States, 472 U.S. at 571 n.12. The trial court found no impermissible motive and granted the trustees relief.
 
 
 20
 When conducting a review for clear error, this court is not allowed merely to substitute its own judgment for that of the trial court. Instead, we are required to affirm unless we are left with a definite and firm conviction that a mistake has been made. See Koirada, 126 F.3d at 1213.
 
 
 21
 The magistrate judge had before him conflicting evidence with respect to the actual motivation held by the Trusts. After a review of the facts presented to the magistrate judge, we are unable to conclude that the fact finder committed clear error.
 
 
 22
 Siemens also contends that, as a matter of law, the National Agreements limit its obligation to make fringe benefit contributions to those earned by journeymen and apprentices only. Because Siemens believes that systems specialists are not journeymen and apprentices, Siemens denies a duty to contribute to the Trusts on their behalf. Siemens argues that the Trusts have no duties with respect to the systems specialists and that any request for documents unrelated to actual or potential Plan participants exceeds the trustees' authority under the CBA and the terms of the Trusts. Under this theory, Siemens contends that the magistrate judge's factual determination that there was no impermissible purpose was not only clearly erroneous, as a matter of fact, but was an incorrect interpretation of the CBA as a matter of law.
 
 
 23
 Two different agreements were in effect during the relevant period, but each contains similar text. Article II of the National Pneumatic Control Systems Agreement for the United States of America dated December 18, 1991 (the "1991 National Agreement") is titled Trade and Work Jurisdiction. It provides: "This Agreement covers the rates of pay, hours and working conditions of journeymen and apprentices engaged in [defined work]."[1] Id. Under Article IX of the 1991 National Agreement, numerous compensation items, including "contributions or deductions for plans, programs, or funds, for union dues, pensions, health and welfare, training, vacations and holidays, supplemental unemployment benefits, sick pay," etc. (most of which are covered by the Trusts), are to be made "[f]or employees covered by this Agreement" "in accordance with those established for all employees in local agreements." Id. at 168.
 
 
 24
 Likewise, the National Pneumatic Control Systems and Mechanical Equipment Service and Maintenance Agreement for the United States of America, anniversary date June 1, 1996, to May 31, 1998 (the "1996 National Agreement"), includes apparent limitations on the scope of the contribution requirements undertaken by Siemens. Paragraph 14.1 provides: "This Agreement covers the rates of pay, fringe benefits, hours and working conditions of journeymen and apprentices engaged in [defined work]." Id. at 172. Also, paragraph 9.1, which refers to payment of wages and benefits, is restricted to "employees covered by this Agreement." Id. More specifically, subparagraph 9.1(b) limits the "[c]ontributions for plans, programs or funds " to "Employees covered by this Agreement." Id.
 
 
 25
 Siemens correctly asserts that, under the terms of the CBAs, contributions are required only for employees covered by the CBA. However, Siemens incorrectly contends that the systems specialists are categorically excluded from the coverage of the broad work-jurisdiction provisions. Siemens's contention, simply put, is that systems specialists cannot generate a contribution requirement because they are neither journeymen nor apprentices. Under that theory, the Trusts could never have a legitimate interest in systems specialists' records because the Trusts would have no administrative duties with respect to the systems specialists.
 
 
 26
 The linchpin of Siemens's argument is the contention that systems specialists are neither journeymen nor apprentices. The contract does not define journeymen or apprentices. In general usage, a journeyman is "a worker who has learned a handicraft or trade, distinguished from apprentice, foreman and master." Webster's New Int'l Dictionary , G.C. Merriam Co. (2d ed. 1941), p. 1342. Likewise, an apprentice is "one who is learning." Id. at 133. Nothing in either of these definitions requires us to read the CBA terms "journeymen and apprentices" to include only union pipefitters and plumbers, as Siemens suggests. Nothing in the record indicates that the contracting parties intended for these terms to be limited to certain types of skilled workers or to exclude certain classes of workers. We are unconvinced that "journeymen and apprentices" exclude the systems specialists.
 
 
 27
 Instead, these terms indicate that both experienced and inexperienced workers alike are entitled to fringe benefit contributions for the covered work that they perform. Having discarded Siemens's erroneous reading of "journeymen and apprentices," the contract coverage terms of the CBA are simply work jurisdiction clauses. Siemens's contribution obligations therefore turn on what type of work the systems specialists, or any other journeyman or apprentice, performs. If the systems specialists engage in the work defined in the coverage section of the contract, Siemens is required to make contributions to the Trusts on their behalf regardless of the employees' union status.
 
 
 28
 The obvious conclusion from this reasoning is that the Trusts have a legitimate interest in determining whether the systems specialists have been engaging in work within the work jurisdiction of the CBAs. The broad documentproduction provisions of the Trust agreements give access to such documents that "the Board of Trustees may reasonably require in connection with the proper administration of the Plan." The time cards and invoices sought by the Trusts contain exactly the type of information that will assist the Trusts in determining the proper scope of Siemens contribution requirement. Thus, as a purely legal matter, the Trusts have authority to audit the records sought in this case unless, as discussed above, the motivation for such audit is to advance an improper purpose. See Central States, 472 U.S. at 571 n.12. The magistrate judge found no such improper purpose.
 
 
 29
 The magistrate judge correctly accepted the argument that the 1991 National Agreement and the 1996 National Agreement each required contributions for work covered under the Agreement, whether or not the particular employee doing that work was covered by the Agreement. We will neither speculate about the results of the audit nor comment on the apparent dispute whether certain types of work are within the work jurisdiction clause. These issues, if not resolved by the parties, can proceed through the CBA grievance procedures.
 
 ATTORNEY FEES
 
 30
 ERISA provides for attorney fees at 29 U.S.C. S 1132(g)(1) ("In any action under this subchapter by . . . a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of the action to either party."). Because an award of fees is discretionary, this court reviews the award for an abuse of discretion. See Estate of Shockley v. Alyeska Pipeline, 130 F.3d 403, 407-08 (9th Cir. 1997). The relevant factors demonstrate that attorney fees were appropriate here, so we affirm the award of attorney fees.
 
 CONCLUSION
 
 31
 The Collective Bargaining Agreements provide a general work jurisdiction basis for contributions to the Trusts. The Trusts have a legitimate administrative interest in the records of employees upon whose behalf contributions may be owed to the Trusts. The magistrate judge did not clearly err in finding that the Trusts were not motivated by an impermissible purpose. The magistrate judge did not abuse his discretion by awarding attorney fees. Accordingly, both the judgment on the merits and the award of attorney fees are affirmed.
 
 
 32
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The 1991 and 1996 National Agreements define the work within the jurisdiction of the CBA. That work is referred to in this opinion as the "defined work" or generally as the work falling within the jurisdiction of the CBA. The exact provisions differ slightly and are reproduced here for completeness. The 1991 National Agreement covers:
 installation, service, and maintenance of all plumbing and/or pipe fitting systems, including pneumatic controls and mechanical equipment (the term mechanical equipment means heating, ventilating, air conditioning and refrigeration systems) and its component parts and also the fabrication, assembling, erection, installation, dismantling, replacement, repairing, reconditioning, adjusting, altering, calibrating, and servicing of all plumbing and/ or pipe fitting systems, pneumatic controls and/or mechanical equipment, and handling, unloading, distributing, reloading, tying-on, and hoisting of all piping materials, appurtenances and equipment used in connection to said plumbing or piping systems, pneumatic controls, and/or mechanical equipment, by any method, including all hangers and supports of every description and all other work included in the trade jurisdictional claims of the United Association.
 The 1996 National Agreement covers:
 installation of all plumbing and/or pipe fitting systems, pneumatic controls and mechanical equipment (the term mechanical equipment means heating, ventilating, air conditioning, refrigeration systems, heat transfer equipment, pumps and all piping systems) including manufacturer installed integrated electronic controls and safety devices mounted on the mechanical equipment and also the fabrication, assembling, erection, installation, dismantling, replacement, repairing, reconditioning, adjusting, altering, and calibrating of all plumbing and/or pipe fitting systems, pneumatic controls. [sic] The handling, unloading, distributing, reloading, tying-on, and hoisting of all piping materials, appurtenances and equipment used in connection to said plumbing or piping systems, and pneumatic controls, by any method, including all hangers and supports of every description.